[Civ. No. 862.   Fifth Dist.   Feb. 26, 1969.]

EVELYN ALLEN, Plaintiff and Appellant, v. BEN R. LEONARD, Defendant and Respondent.

210

W. J. Cossette for Plaintiff and Appellant.

Lamb & Glynn and Charles G. Norris for Defendant and Respondent.

CONLEY, P. J.—Dr. Ben R. Leonard was sued for alleged malpractice said to have occurred during the period of

approximately one year while he was intermittently treating the plaintiff; however, in presenting her case, counsel for plaintiff at the trial covered the entire period of approximately 13 years, from the time of her first illness until after discharge from the University of California Hospital in San Francisco, including care by her present medical doctor in San Jose. The period involved in the record included treatment for many years and by many different doctors other than the defendant. It is claimed that the defendant doctor's negligence caused many, but not all, of her troubles.

The appellant asserts that the record shows that the defendant and respondent was guilty of negligence and that it basically caused much of the trouble which Mrs. Allen has suffered through the years. The trial court, on the other hand, found that Dr. Leonard was not guilty of malpractice. The alleged cost of treatment of all of her medical troubles has amounted to more than $8,000, and from some of the ills from which she suffered there were times when her death appeared to be a possibility; although her present condition is vastly improved over what it has been at times in the past, she alleges that she is still suffering drawbacks from what she claims was the improper practice of Dr. Leonard.

The complaint charges that, in about the month of April 1962, plaintiff employed defendant as her physician and surgeon, and that she remained under his care until about the 15th day of April, 1963; that during the period the doctor treated and cared for her for rectal, abdominal, vaginal and respiratory problems, and that he was negligent in the following particulars:

1) That he negligently prescribed and administered to plaintiff an excessive amount of antibiotics and other drugs;

2) That he was negligent in failing to exercise reasonable medical supervision of plaintiff, or to properly observe her condition during the administration and use of said drugs;

3) That he was negligent and careless in the prescription and administration of certain drugs, knowing of plaintiff's systemic allergy to them;

4) That he was also negligent and careless in that he waited an unreasonable length of time before calling in or consulting with a specialist after she became seriously ill as a result of said negligence and carelessness;

5) That he was negligent in delaying execution of plaintiff's request for a specialist for an unreasonable length of time;

6) That he was careless and negligent in failing to use and employ recognized procedures in the care and treatment of plaintiff and for the correction of the conditions he carelessly and negligently caused.

Paragraph VI of the complaint alleges:

"By reason of the negligent and careless acts and conduct of the defendant and by reason of the treatment reasonably required in an attempt to correct and cure the condition caused by such carelessness and negligence, plaintiff was injured as follows: She was made sick, nervous, sore, anemic, debilitated; that she received severe shock to her entire nervous system; that she received a pseudomembranous ulcerated colitis and other intestinal disorders; that her metabolic system was disturbed, changing her body functions, causing decay of teeth and change of personality; that she required an opening in her abdomen for drainage; that she sustained phlebitis; all of which injuries plaintiff is informed and believes are of a permanent nature."

The plaintiff sued for $250,000, besides special damages for hospital and medical care.

The answer denied any negligence on the part of the doctor or that any damages were due to the plaintiff from him.

The pretrial conference order specified the issues in dispute as follows:

1) The negligence of the defendant;

2) The proximate cause of the injury, if any, sustained by the plaintiff;

3) The injuries and damages, if any, suffered by the plaintiff.

When the time fixed for the trial arrived, counsel for the two parties waived a jury, and stipulated that the case could be heard by Judge Maushart. The testimony occupied five days and, after argument and the submission of the case, the trial judge made findings of fact as follows:

1) That Dr. Leonard is a duly licensed physician and surgeon, engaged in the practice of his profession in the County of Merced, State of California;

2) That plaintiff employed the defendant as her physician and surgeon commencing in April 1962 and continuing until April 15, 1963;

3) That the defendant did not negligently or carelessly prescribe and administer certain drugs in excessive amounts;

4) That the defendant did not negligently or carelessly treat plaintiff;

5) That the defendant did not negligently administer certain drugs in excessive amounts with knowledge of Mrs. Allen's systemic allergy to them, or fail properly to observe her condition during such administration;

6) That the defendant did not negligently fail to take action to correct conditions complained of by plaintiff;

7) That the defendant did not carelessly or negligently fail to employ a specialist;

8) That the defendant did not negligently fail to use and administer recognized procedures in the care and treatment of plaintiff for correction of the conditions plaintiff complained of to defendant;

9) That the defendant did not negligently cause the plaintiff to be made sick, nervous, sore, anemic, debilitated; or to acquire a toxic megacolon, severe shock to the nervous system, pseudomembranous ulcerated colitis or other intestinal disorders, or to cause plaintiff's metabolic system to be disturbed, to change her body functions, to cause decay of teeth, or change of personality, the opening of her abdomen for draining, or phlebitis;

10) That the defendant did not negligently cause plaintiff to require hospital and medical care and attention;

11) That the defendant possessed and exercised the ordinary degree of care and skill ordinarily possessed and exercised by doctors of medicine practicing in the same or similar locations; that in the exercise of ordinary care the defendant made an error in judgment and mistake in diagnosis;

12) That a similar error in judgment and mistake in diagnosis was made at Ceres Memorial Hospital where plaintiff was taken and was under the care of specialists;

13) That a similar error in judgment and mistake in diagnosis was again made at the University of California Hospital, where plaintiff was again under the care of specialists.

The judgment was that plaintiff take nothing by her complaint and that the defendant should recover his costs of suit. A motion for a new trial was denied.

▉ The prime inquiry on this appeal must be whether or not the trial judge had legitimate ground to find the facts as above stated. Appellant concedes that no expert witness specifically characterized Dr. Leonard's work as negligent, and reliance is placed largely on the contention that res ipsa

loquitur should have been applied to the doctor's handiwork, contrary to the trial judge's ruling.

It is contended, apparently for good measure, that the trial judge did not realize the breadth of the issues involved in the case and incorrectly thought the essential charge was that Dr. Leonard's diagnosis was wrong. It is a grave mistake to contend that the judge had such a restricted viewpoint concerning the charge of negligence, as is shown conclusively by the preceding review of the findings.

The judge had before him testimony of a qualified expert that nothing done by Dr. Leonard was negligent. The medical expert called by the defendant, Dr. Robert J. Mills, testified in response to questions:

"Q. Doctor, you are familiar with the standard of care and practice by physicians in the west side of Merced County? A. Yes, I am.

"Q. And you receive many referrals from doctors in that community, is that correct? A. I do.

"Q. And in your review of the records of Dr. Leonard, do you find his to be within that standard of care? A. Yes, I do."

This statement of the doctor familiar with the case and the applicable standard of care is sufficient foundation in itself for the finding by the court that Dr. Leonard was not negligent. Dr. Mills thus established the standard of care on the west side of the San Joaquin Valley where Dr. Leonard practiced, and we cannot properly refind the facts or quarrel with the summary of evidence accepted by the court as trier of fact.

Turning to the transcript in its entirety, there can be no doubt that the trial judge had ample evidence from which to conclude that the defendant and several of the doctors who later treated plaintiff, made an error of judgment in diagnosis in that they believed she was afflicted with pseudomembranous enterocolitis while, in fact, her major disease was ulcerative colitis. The evidence shows that no one, even the most skillful specialist, knew what the cause of ulcerative colitis was and, therefore, the defendant doctor could not very well be convicted of causing it. There can be no question that Dr. Leonard gave massive doses of penicillin and other antibiotic drugs, and that some of the other doctors who testified said they would not have given such large prescriptions at the time and under the circumstances when ordered by Dr. Leonard. There can also be no question but that Mrs. Allen was very

sick and that at times her illness approached almost fatal seriousness. But these facts alone do not tend to require a finding that Dr. Leonard was guilty of negligence or that the plaintiff should recover damages from him.

In 38 California Jurisprudence, Second Edition, Physicians, Etc., section 69, pages 678 et seq., it is said: " 'Malpractice' may be defined as the neglect of a practitioner of a healing art to have and apply that degree of skill and learning in treating a patient that is customarily applied in treating the sick or wounded similarly afflicted in the same community and under the same circumstances. . . .

"A practitioner is not to be held responsible merely because his treatment of a patient was not successful or was accompanied by untoward consequences. . . . The practitioner is not omniscient or capable invariably of knowing that his professional acts will achieve the desired result; he is responsible only where it is established that he did not act with the knowledge or foresight of practitioners generally or as a reasonably skillful and experienced practitioner would have acted in the same circumstances. The law does not require that a physician have the highest skill medical science knows. He is deemed to represent that he has only that reasonable degree of learning and skill possessed by practitioners of the same school or method in the locality and which is ordinarily regarded by those conversant with his type of practice as necessary to qualify him to engage therein. And the law makes allowance for human weakness in the application of skill and learning. The practitioner is required to use his best judgment in exercising his skill and applying his knowledge, but mere errors in judgment are not ground for liability unless the skill and judgment actually employed fall below the standard." (See *Donahoo* v. *Lovas*, 105 Cal.App. 705 [288 P. 698]; *Markart* v. *Zeimer*, 67 Cal.App. 363 [227 P. 683]; *Reynolds* v. *Struble*, 128 Cal.App. 716 [18 P.2d 690]; *Walter* v. *England*, 133 Cal.App. 676 [24 P.2d 930].) Negligence on the part of a doctor is never presumed (*Markart* v. *Zeimer, supra*; *Bruce* v. *United States*, 167 F.Supp. 579).

In a malpractice case, generally speaking, the doctor must be tested with respect to his knowledge and skill by the average knowledge and skill of practitioners of the same school of medicine in the locality where the doctor carries on his profession. (*Thomason* v. *Hethcock*, 7 Cal.App.2d 634 [46 P.2d 832]; *Priestley* v. *Stafford*, 30 Cal.App. 523 [158 P. 776]; *Dameron* v. *Ansbro*, 39 Cal.App. 289 [178 P. 874];

*McNamara* v. *Emmons,* 36 Cal.App.2d 199 [97 P.2d 503];
*Gluckstein* v. *Lipsett,* 93 Cal.App.2d 391 [209 P.2d 98].)
It should be noted that Dr. Leonard was a general
practitioner and did not claim to be a specialist, and that the
amount of care to be expected from a general practitioner in a
given locality is not as great as that expected from a special-
ist. (38 Cal.Jur.2d, Physicians, Etc., § 76, p. 688.)

While Dr. Leonard first saw Mrs. Allen in April of 1962,
the history of her illnesses and treatment by other doctors was
initiated long before. Some of these occurrences may not have
been important; others may well have been. Mrs. Allen herself
testified that she had given birth to four children; in a former
period of her life she had dermatitis and was allergic to cer-
tain substances, including ammonia and detergents; in the
year of 1961, she had a panhysterectomy and was operated on
twice for hemorrhoids; at one time she also thought she had
gallbladder trouble, and was hospitalized. In 1953, she and
her husband went down to El Centro and at that time a Dr.
Thompson gave her a prescription of a drug with mycin in it,
and she got very sick, it taking three months to get over the
sickness. Whether or not the mycin caused the illness, as she
thought, or whether it was an early flare-up of what later was
her major disease is a matter of guesswork.

A Dr. Cantrell performed the hysterectomy, and numerous
doctors besides Dr. Leonard treated her for various com-
plaints. A Dr. Roscoe operated on her, performing a hemor-
rhoidectomy in 1952. She had a serious cold and sore throat
for a long time in 1952. She was in bed for two weeks at El
Centro on the occasion heretofore referred to; a Dr. Polotti
was there consulted with regard to her diet. She had sore
throat and earaches at various times, and was treated by
numerous doctors who gave her various drugs. She had female
complaints later, and a Dr. Glynn gave her a barium enema.
She was cared for medically by Dr. Thompson for fissures in
the rectum, and she was also treated for a water tumor on an
ovary. At various times, she had diarrhea and bleeding,
thought by several physicians to be from the hemorrhoids, but
possibly from other sources. She received various prescrip-
tions from a number of doctors over some thirteen years.

On April 9, 1962, Mrs. Allen first saw Dr. Leonard, and at
that time complained of thyroid difficulties for which he
treated her. In May of 1962 she had rectal bleeding and
hemorrhoids were located; it was discovered that she had a
polyp in the left colon and a complete hemorrhoidal ring; a

biopsy showed no malignancy. On June 12, 1962, Dr. Leonard gave her a general checkup, and on November 30, 1962, he conducted another general checkup and examination of her colon. On January 3, 1963, there was rectal bleeding accompanied by pain, and a barium enema was given her. A Dr. Nelson conducted a hemorrhoidectomy and an anoplasty in January 1963. The anus was dilated a number of times thereafter by Dr. Leonard. An operation on the Bartholin's gland, for an infection, was conducted. During this time the defendant doctor prescribed a number of drugs for administration, both in and out of the hospital. A stomatitis and a secondary Monilia and thrush developed, and the medication was designed for what appeared to be the condition of the patient and treatment of what Dr. Leonard tentatively diagnosed as pseudomembranous enterocolitis. After he treated plaintiff she was removed to the Memorial Hospital on the east side of Stanislaus County, and then to the University of California Hospital in San Francisco; she was under the successive care of many other doctors, including Dr. Meyers, Dr. Friedman, Dr. Shapiro, and Dr. Corsiglia, who either prescribed for her or operated on her.

It seems clear from a reading of the testimony of the medical men that the tentative diagnosis of pseudomembranous enterocolitis was incorrect, and that actually the patient was suffering from ulcerative colitis; just when she was first afflicted with the disease, and the causative factors, are not ascertainable from the record. The trial court found that a mistake had been made in the diagnosis, and also remarked that other doctors, including experts in the field, tentatively also made the wrong diagnosis. The fact that the diagnosis was incorrect does not necessarily mean that the doctors who reached that conclusion were negligent. (38 Cal.Jur.2d, Physicians, Etc., § 69, p. 680.) On the contrary, Dr. Leonard's mistake, made in good faith, appears to have been an excusable error that even specialists in the field later made.

While some of the medical witnesses stated that they would not have done everything in the treatment of Mrs. Allen that Dr. Leonard did, there is no proof that he did not properly act in accordance with the applicable standard of care; it must be remembered (1) that he was not and did not profess to be a specialist, (2) that his mistake in diagnosis did not in itself establish negligence, (3) that he testified that the treatment he gave was proper on the assumption that his tentative diagnosis was correct, (4) that no one of the medical wit-

nesses gave it as his opinion that Dr. Leonard was negligent, and (5) that the witness Mills, the only doctor who testified that he knew the standard of care applicable to Dr. Leonard, gave it as his opinion that the defendant acted in accordance with the standard of care in the locality where he carried on his practice. This being so, the findings of fact made by the trial court to the same effect cannot be overturned by this court.

Grasping at a straw, the appellant claims that the duty fell upon the defendant to carry the burden of justifying his treatment of the plaintiff under the doctrine of res ipsa loquitur. Thus, the attempt is made to shift to Dr. Leonard the necessity of carrying the burden of proof that he was not negligent. This contention is without merit. In *Siverson* v. *Weber*, 57 Cal.2d 834, at page 836 [22 Cal.Rptr. 337, 372 P.2d 97], it is said: "As a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. (Citing cases.) In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied on both common knowledge and the testimony of expert witnesses." (See also *Faulk* v. *Soberanes*, 56 Cal.2d 466, 470 [14 Cal.Rptr. 545, 363 P.2d 593]; *Wolfsmith* v. *Marsh*, 51 Cal.2d 832, 835 [337 P.2d 70, 82 A.L.R.2d 1257]; *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 442-447 [247 P.2d 344]; *Inouye* v. *Black*, 238 Cal.App.2d 31, 33 [47 Cal.Rptr. 313, 14 A.L.R.3d 961]; 82 A.L.R.2d 1262; 162 A.L.R. 1265.) In the present case it has not been proven that there was negligence or that Dr. Leonard was probably the cause of any untoward result. There is no basis for the application of res ipsa loquitur to this case.

There are two rulings relative to evidence which are urged by the appellant as grounds for reversal. In one instance, it was originally ordered that the drug company's pamphlet or explanation chart, which accompanied one of the prescribed drugs, was admissible in evidence after the defendant doctor said on the stand he had consulted it. In the absence of a showing that the defendant doctor used such a pamphlet in prescribing and giving the medicine in question, such evidence could not have been received at all over objection, because if it did not form the basis of treatment by the doctor there would have been no reason to receive it in evidence any more than a standard work on some disease

involved in a malpractice case if it had not been used by a witness in forming his opinion on some medical question; the availability of cross-examination is a most important right, either in prosecution or defense, and to admit in evidence such an unused pamphlet would be to authorize evidence with respect to which the right of cross-examination was denied. However, here the proper foundation had been established to the effect that the defendant had used the pamphlet. But when it developed that the particular pamphlet offered in evidence was printed and distributed at a date subsequent to the prescription of the drug by Dr. Leonard, the trial court properly struck the offending exhibit. At that time plaintiff's counsel said that he would secure the antecedent pamphlet which was in effect when Dr. Leonard was familiar with it and prescribed the drug. But without later explanation, the plaintiff's attorney never fulfilled this promise. The trial court was correct in striking the pamphlet because it was not in existence at the time of the administration of the drug and obviously could not have been used by the defendant doctor.

■ The other ruling on the evidence which is excepted to by the plaintiff dealt with the proffered transcription of a reel containing statements of Dr. Leonard, secretly taken without his knowledge, relative to certain aspects of his treatment of Mrs. Allen. The court ruled that there had not been a proper foundation for the evidence in that it was not shown that the alleged admissions were recorded on a machine which accurately reproduced the conversation of the people present at the time of the event. Such evidence could easily have been made available if a proper foundation had been effected by showing that the machine reproduced an accurate statement of what was said. Incidentally, the court also erroneously based its ruling on the fact that Dr. Leonard did not know that the statement was being taken. The first ground above mentioned was ample to justify the ruling, and it is a source of amazement if the statement was properly taken that there was no attempt to lay a sound foundation.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.